**IN THE COURT OF APPEALS OF IOWA**

No. 21-1194
Filed August 17, 2022

IN RE THE MARRIAGE OF ERICA MARIE TUNINK
AND BRIAN JOHN TUNINK

Upon the Petition of
ERICA MARIE TUNINK,
     Petitioner-Appellant,

And Concerning
BRIAN JOHN TUNINK,
     Respondent-Appellee.

_____

     Appeal from the Iowa District Court for Guthrie County, Richard B. Clogg,

Judge.


     Erica Tunink appeals from the district court's property distribution and denial

of trial attorney fees. **AFFIRMED AS MODIFIED.**


     David L. Jungmann of David L. Jungmann, P.C., Greenfield, for appellant.

     Todd J. Argotsinger and Bryan D. Swain of Salvo, Deren, Schenck, Gross,

Swain & Argotsinger, P.C., Harlan, for appellee.


     Considered by Bower, C.J., and Schumacher and Ahlers, JJ.

**AHLERS, Judge.**

Erica and Brian Tunink met while attending Iowa State University. They married in 2002, shortly after graduating. The parties have four children. In 2019, Erica filed this dissolution-of-marriage action. The case went to trial.

The evidence at trial shows that both parties were employed at the time of trial. Brian has been consistently employed throughout the marriage. Erica has also maintained employment outside the home, except for a lengthy period when she worked as a stay-at-home mom for the family. In addition to their employment, the parties operated a grain and cattle farm.

Following trial, the district court issued a decree (1) granting the parties joint legal custody and joint physical care of the children; (2) ordering Brian to pay child support; (3) dividing the assets and debts of the parties; and (4) declining Erica's request for attorney fees. Erica appeals. She challenges the property division, challenges the denial of her request for trial attorney fees, and asks for appellate attorney fees.

## I. Property Division

We review property division issues in dissolution-of-marriage proceedings de novo.[1] In conducting our de novo review, we give weight to the district court's findings, especially as to witness credibility, but we are not bound by them.[2] "We will disturb the district court's 'ruling only when there has been a failure to do equity.'"[3]

---

[1] *In re Marriage of McDermott*, 827 N.W.2d 671, 676 (Iowa 2013).
[2] *McDermott*, 827 N.W.2d at 676.
[3] *McDermott*, 827 N.W.2d at 676 (quoting *In re Marriage of Schriner*, 695 N.W.2d 493, 496 (Iowa 2005)).

In dissolution-of-marriage proceedings, Iowa is an equitable distribution state.[4] This means marital property is to be divided equitably after considering the factors outlined in Iowa Code section 598.21(5) (2019).[5] While equitable distribution of marital property does not require equal division, equality is often most equitable.[6]

The appellate battle over property division starts on uncertain ground due to the fact that the district court did not make specific findings regarding the value of the parties' property or the total value of property awarded to each party. The district court similarly did not make specific credibility findings. Instead, the totality of the district court's findings as to asset and debt values is summed up in a single sentence reading, "The value of the assets as of the date of trial are most accurately shown in Erica's Exhibit 58." This cryptic reference is made even more so by the fact that the referenced exhibit lists both Erica's and Brian's opinions as to values of several assets. Nevertheless, we take the quoted sentence to mean two things. First, to the extent there is a dispute over the value of an asset or debt, the court valued it at the value placed on the item by Erica in her exhibit. Second, the reason the court accepted Erica's opinions on value is that the court found her opinions on the disputed values more credible than Brian's. It is from this frame of reference that we conduct our de novo review.

The crux of Erica's challenge to the property division is that Brian received a larger amount of the marital net worth, so Erica is entitled to a property settlement

---

[4] *In re Marriage of Miller*, 966 N.W.2d 630, 635 (Iowa 2021).
[5] *Miller*, 966 N.W.2d at 635.
[6] *In re Marriage of Kimbro*, 826 N.W.2d 696, 703–04 (Iowa 2013).

payment (or transfer of assets) to balance each party's net worth. Brian responds that Erica received a larger share of the marital net worth, so balancing each party's net worth would require Erica to pay him a property settlement payment. In spite of the claim that Erica received more than he did, however, Brian does not cross-appeal and is content to let the district court's property division stand.

Before proceeding to the dispute as to values of specific items, we note that exhibit 58—the exhibit relied upon by the district court in setting values and distributing property—omits a number of assets and debts. So, it will be necessary for us to add to the list of items from that exhibit to get a true sense of the financial picture of the parties. This addition results in significant additional debts, most of which were made the responsibility of Brian, which decreases the disparity in the share of net worth received by the parties.

If we accepted Erica's exhibit as an exhaustive list of assets and debts with the values she assigned to them, then she would be correct that she would be owed a sizable property settlement payment (or receive additional assets previously awarded to Brian). On the other hand, if we consider additional debts omitted from Erica's exhibit and place different values on some of the assets— values Brian asserts are warranted by the evidence—Brian would not owe a property settlement payment to Erica. So, we now turn to the specific assets and debts that are in dispute.

### A.    The Disputed Items

Although we have considered the values of all assets and debts that are disputed, we will only address those disputes that we determine to have merit or warrant further comment. As to the value of any items we do not address, we

accept the district court's valuations as contained in Erica's exhibit 58, finding the values equitable, as they are within the range of the evidence.[7]

### 1. Erica's House

By incorporating the values from Erica's exhibit, the district court accepted the value of Erica's house at $81,000. No persuasive evidence supports this figure. In an affidavit early in the case, Erica valued the property at $95,000. Also, evidence establishes the assessed value of the house at $87,470. Understanding that Erica's valuation early in the case may have been made without full information, we reject Brian's request to value the house at Erica's initial valuation of $95,000. Nevertheless, given the lack of evidence supporting a value of $81,000, we find the value placed on the property by a neutral third-party, specifically the county assessor, to be the most persuasive evidence of value.[8] We value Erica's house at the assessed value of $87,470.

### 2. Income Tax Refunds

In her exhibit incorporated by the district court, Erica included as an asset Brian's 2019 income tax refund of $9082, but she neglected to include her own refund of $10,212. Brian protests this disparate treatment. We agree.

To begin, we balk at treating tax refunds as an identifiable, stand-alone asset. Absent a party holding a refund check, the refund does not exist as an asset. Instead, a refund is usually deposited in a bank account. Indeed, both

---

[7] *See In re Marriage of Hansen,* 733 N.W.2d 683, 703 (Iowa 2007) ("Ordinarily, a trial court's valuation will not be disturbed when it is within the range of permissible evidence.").

[8] *See In re Marriage of Lukowicz*, No. 14-0088, 2015 WL 162089, at *3 (Iowa Ct. App. Jan. 14, 2015) (approving use of assessed value when faced with competing valuations).

parties' tax returns show that they elected to receive their refunds by direct deposit. So, these parties have no stand-alone "tax refund" asset. As is commonly the case, their refunds became a deposit into a bank account. At that point, due to the fungibility of money, the tax refunds each party received are part of the marital net worth directly or indirectly by becoming an asset (e.g., a higher balance in the bank account into which the refunds were deposited), becoming a different asset (e.g., if the money in the bank account was used to purchase some other asset), decreasing a liability (e.g., if the money in the bank account was used to pay a debt), paying a marital bill (thus avoiding the incurring of a debt or the use of a different asset to pay the bill), or some combination of those uses.[9] Here, evidence was introduced as to the values of the parties' assets and debts at the time of trial, including current balances of bank accounts. The tax refunds both parties received are reflected in the assets and debts that remain and are subject to division. The refunds are not identifiable, stand-alone assets that warrant separate division. Instead, we equitably divide the identifiable assets and debts the parties had left at the time of trial, which has the effect of equitably dividing any refunds the parties received.

### 3. Stimulus Money

Uncontroverted evidence establishes that the parties received stimulus money prior to trial and they evenly divided it. In spite of the equal division, just as she did with the income tax refunds, Erica attempts to separately account for the

---

[9] *See In re Marriage of Van Voorst*, No. 21-0228, 2021 WL 5106054, at *2 (Iowa Ct. App. Nov. 3, 2021) (discussing the fungibility of wages and how they directly or indirectly contribute to the marital estate).

stimulus money Brian received by including it as an asset on his side of the ledger while neglecting to include the stimulus money she received as an asset on her side. To some degree, the equal division of the stimulus money is a red herring, as it doesn't matter who received it due to its status as a marital asset. Just like the tax refund money, the stimulus money does not exist as an identifiable, stand-alone asset. Instead, the receipt of the money is reflected in the assets and debts the parties have left to divide. For the same reason tax refund money should not be separately accounted for, neither should the stimulus money.

### 4.     Vehicles & Vehicle Debt

Brian points to a number of valuation issues regarding the vehicles as a basis for upholding the district court's property division. We will address each issue separately.

By adopting the values from Erica's exhibit, the district court valued the 2006 Ford Expedition awarded to Brian at $5267. This valuation conflicts with the evidence. Brian estimated the value of this vehicle at $2500. Although Erica's exhibit valued the vehicle at $5267, her trial testimony was that the vehicle was in need of some work and was only worth $3000 to $4000. In light of this evidence, we find the 2006 Ford Expedition to be worth $3000.

Brian also notes that Erica's exhibit neglects to list a 1999 Chevrolet Lumina that Erica admits to purchasing and valuing at $800. While this is true, we also note that the Lumina was purchased as a vehicle for the children to drive. We put this in the same category as the 2002 Ford F-350 and its corresponding indebtedness. While the testimony was that the parties' oldest child bought the Ford F-350, the testimony also established that the vehicle was titled in Brian's

name. It is not clear who is responsible for the debt associated with this truck. Regardless of who is responsible, it appears there is little to no equity in the Ford F-350. We find the most equitable way to address both vehicles purchased for the use of the children is to award the vehicle to the party involved with purchasing it and to make that party responsible for any corresponding debt without any values appearing on that party's side of the ledger. So, Erica receives the Lumina and is responsible for any debt associated with it. Brian receives the Ford F-350 and is responsible for any debt associated with it.[10] However, neither party will have any value, positive or negative, placed on that party's side of the ledger for these vehicles or corresponding debt when determining equitable distribution.

Although Brian raises issues about the value of other vehicles, including a camper, we find no reason to modify the values placed on them by the district

---

[10] In making Brian solely responsible for the debt associated with the Ford F-350, we are mindful of our direction as to how to handle conditional debt in *In re Marriage of Towne*, 966 N.W.2d 668 (Iowa Ct. App. 2021). In *Towne*, we addressed student loan debt incurred by the parties' children for which one or both parents cosigned. 966 N.W.2d at 675. The plan was for the children to be responsible for payment of their student loan debt, and the two oldest children, who had graduated from college, were making the agreed-upon payments. *Id.* Under those circumstances, given the contingent and speculative nature of the parents' liability for the student loans, we found it inequitable to assign responsibility to one parent and include it on that parent's side of the ledger for purposes of calculating property division. *Id.* Instead, we found it equitable to make both parties equally responsible for the debt if and when a child defaulted on a loan and either party became legally responsible for it. *Id.* at 676. We find the equities here to be different from those in *Towne*. In *Towne*, there was a joint plan to take out the loans, a joint plan for how it was to be repaid, and joint participation in obtaining the loans. *Id.* at 675. In contrast, the incurring of debt to buy the Ford F-350 was done exclusively by Brian and the child, with no input from or discussion with Erica. There is also no established history of the child making payments, as there was in *Towne*. Under the circumstances here, Brian should be responsible for any debt that may be owed if the party's oldest child does not satisfy the pickup loan as planned.

court. The values used are reasonable and within the range of the evidence.[11]

### 5. Miscellaneous Debts

Erica placed a value on her Amazon credit card debt of $1497. However, during her trial testimony, she admitted the balance of this debt was approximately $100. We agree with Brian that this debt should be valued at $100.

The district court listed a number of debts and made them Brian's responsibility. However, none of these debts were listed on Erica's exhibit 58, calling into question how or if the district court valued them given its incorporation of Erica's exhibit. Brian does not disagree that he should be responsible for these debts. He merely wants to receive credit for them based on their current balances. We agree that Brian should remain responsible for these debts and that he should receive credit for them when comparing each party's respective net worth. The balances of these debts are largely undisputed, and we value them as stated on the recapitulation statement set forth later in this opinion.

### 6. Grain

Erica's exhibit did not include a value for grain Brian received. We agree with Brian that he should receive the grain at a value of $10,300.

### 7. Other Challenges

We decline to change the other values listed on Erica's exhibit that was adopted by the district court, finding them to be within the permissible range of the evidence.[12]

---

[11] *See Hansen*, 733 N.W.2d at 703.
[12] *See Hansen*, 733 N.W.2d at 703.

**B.  Recapitulation Statement**

Having valued the disputed items as detailed above, we determine the parties should receive the assets and debts as set forth in the following recapitulation statement.  We have rounded to the nearest dollar in setting values for each item.  Assets appearing in one party's column are awarded to that party, and debts appearing in one party's column shall be the responsibility of that party.

| Description of Asset or Debt | Erica | Brian |
|---|---|---|
| Guthrie Center Residence | | 250,000 |
| First mortgage on Guthrie Center property | | (194,881) |
| Second mortgage on Guthrie Center property | | (97,426) |
| Farmland | | 61,252 |
| Contract with Brian's mother | | (21,445) |
| Adair Residence | 87,470 | |
| Mortgage on Adair property | (48,488) | |
| Home furnishings | 2850 | 23,755 |
| 2019 Ford Taurus | 17,995 | |
| Loan on Taurus | (18,689) | |
| 1999 Chevrolet Lumina | No Value | |
| 2006 Expedition | | 3000 |
| 2001 GMC 12 Passenger Van | No Value | No Value |
| 2006 Dutchmen Camper | | 6660 |
| 2003 Buick Century | 800 | |
| 2002 Ford F350 (Son) | | No Value |
| F350 Auto Loan (Son) | | No Value |
| 2012 IH 4300 Diesel Service Truck | | 38,548 |
| 3B Farms—Diesel Truck Loan | | (36,315) |
| Health Savings Account | Unknown | |
| Wife Checking | 995 | |
| Wife Savings | 2722 | |
| Husband Account 49 | | 482 |
| Husband Account 21 | | Unknown |
| Husband Account 22 | | 2520 |
| Puck Implement 401k | | 35,104 |
| Agrivision Equipment 401k | | 15,076 |
| Invesco | | 2889 |
| IPERS | 4040 | |
| Two rifles | | 750 |

| | | |
|---|---:|---:|
| Computer | | 1500 |
| Husband Best Buy credit card | | (1438) |
| Wife Student Loan | (5233) | |
| Husband Student Loan | | (799) |
| Wife Amazon credit card | (100) | |
| Wife Best Buy credit card | (328) | |
| Husband Chase credit card | | (456) |
| Wife—other bank loan | (6608) | |
| Nebraska Furniture Mart credit card | (1100) | |
| Machinery | | 28,150 |
| Mechanic's Tools | | 15,000 |
| Cows and Bulls | | 56,483 |
| Calves | | 26,335 |
| Cattle Note | | (52,079) |
| 2018 Operating Note | | (73,915) |
| 2017 Operating Note | | (13,820) |
| Farm Grain | | 10,300 |
| John Deere Financial debt | | (4044) |
| Mike's Plumbing debt | | (2250) |
| Guthrie County Vet debt | | (1450) |
| Adair Feed & Grain debt | | (625) |
| Lehman Service debt | | (1125) |
| 2018 Rent to Brian's mother | | (22,000) |
| Butler Storage debt | (1370) | |
| | | |
| **Total** | 34,956 | 53,736 |

As shown, Brian received a greater share of the marital net worth than Erica. In considering the factors set forth in Iowa Code section 598.21(5) and the notion that "equality is most often equitable," we find an equalization payment is necessary.[13] Accordingly, we find Brian is responsible for paying to Erica an equalization payment of $9390. Upon payment of this amount, Erica and Brian's net worth will equalize at $44,346, which we consider to be equitable under the circumstances of this case.

---

[13] *See Kimbro*, 826 N.W.2d at 703 (quoting *In re Marriage of Fennelly*, 737 N.W.2d 97, 102 (Iowa 2007)).

We modify the district court's decree to impose a property settlement judgment in favor of Erica against Brian in the amount of $9390. Brian shall have sixty days from the date of procedendo to pay the judgment; Erica cannot engage in collection efforts and interest shall not accrue on the judgment during this sixty-day period. If Brian does not satisfy the judgment within sixty days of procedendo, interest shall begin accruing on the judgment at the statutory rate and Erica can utilize all collection efforts permitted by law.

## II.    Trial Attorney Fees

In a dissolution-of-marriage action, we review the award or denial of attorney fees for an abuse of discretion.[14] The decision regarding whether to award attorney fees to a party depends on the parties' respective abilities to pay.[15] "[T]he complaining party must show the district court abused its discretion."[16]

Erica contends Brian should be responsible for paying her trial attorney fees because his "refusal to obey court orders for discovery, for sharing of expenses for the children's care, and for payment of suit money caused Erica extraordinary expense and concern." Driving up costs by failing to cooperate with discovery can be considered in deciding whether to award attorney fees.[17] However, we note the district court's observation that this litigation was contentious in general—not one-sided—and, on our review of the record, Erica has not demonstrated that the district court abused its discretion in denying an award of attorney fees.

---

[14] *Towne*, 966 N.W.2d at 680.
[15] *Towne*, 966 N.W.2d at 680.
[16] *In re Marriage of Hazen*, 778 N.W.2d 55, 61 (Iowa Ct. App. 2009).
[17] *In re Marriage of Lenz*, No. 05-0997, 2006 WL 782712, at *6 (Iowa Ct. App. Mar. 29, 2006).

### III. Appellate Attorney Fees

Erica seeks an award of appellate attorney fees. "Appellate attorney fees are not a matter of right, but rather rest in this court's discretion."[18] "Factors to be considered in determining whether to award attorney fees include: 'the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal.'"[19] Each party prevailed on one issue in this appeal. Further, while Brian earns more than Erica, the current disparity is not great. We also note that, while we equalized the property division, Brian is taking on a much larger debt load than Erica that he will need to service. Accordingly, we exercise our discretion to deny Erica's request for appellate attorney fees.

### IV. Conclusion

We modify the district court's decree to require Brian to pay a property settlement payment to Erica in the amount and on the terms described in this opinion. We affirm the denial of Erica's claim for trial attorney fees, and we deny her request for appellate attorney fees. Costs on appeal shall be divided equally between the parties.

**AFFIRMED AS MODIFIED.**

---

[18] *In re Marriage of Okland*, 699 N.W.2d 260, 270 (Iowa 2005).
[19] *Okland*, 699 N.W.2d at 270 (quoting *In re Marriage of Geil*, 509 N.W.2d 738, 743 (Iowa 1993)).