**IN THE COURT OF APPEALS OF IOWA**

No. 23-1458
Filed August 7, 2024

**IN RE THE MARRIAGE OF JENNIFER RAYBURN
AND CLIFFORD RAYBURN**

**Upon the Petition of
JENNIFER RAYBURN, n/k/a JENNIFER SLIFER,**
        Petitioner-Appellee,

**And Concerning
CLIFFORD RAYBURN,**
        Respondent-Appellant.
_____

        Appeal from the Iowa District Court for Marshall County, John R. Flynn,

Judge.


        A father appeals the district court's denial of his petition to modify the

physical-care and legal-custody provisions of the parties' dissolution decree.

**AFFIRMED.**


        Earl B. Kavanaugh of Harrison & Dietz-Kilen, P.L.C., Des Moines, for

appellant.

        Joel C. Waters of Kaplan & Frese, LLP, Marshalltown, for appellee.


        Considered by Ahlers, P.J., and Chicchelly and Buller, JJ.

**AHLERS, Presiding Judge.**

During the marriage of Cliff Rayburn and Jennifer Slifer, they had three children, born in 2005, 2007, and 2009. The couple divorced in 2010. Their stipulated dissolution decree gave them joint legal custody of the children, placed the children in the mother's physical care, and granted the father visitation on the first and third weekends of each month and three weeks in the summer.

In 2021, following several years during which the father did not receive the full visitation time afforded to him by the decree, the father filed a petition to modify the decree. He sought physical care and sole legal custody of the children. Although the district court found the father established a material change in circumstances, it determined he failed to establish he could provide the children with superior care and denied his petition. The father appeals, arguing he has shown he is the superior parent and that placing the children in his physical care and his sole legal custody is in their best interest.[1]

We review rulings on petitions seeking to modify physical-care provisions de novo. *In re Marriage of Harris*, 877 N.W.2d 434, 440 (Iowa 2016). With de novo review, we give weight to the district court's fact findings, especially regarding credibility, but we are not bound by them, as we make our own fact findings. *Id.*

The goal in physical-care determinations "is to place the children in the environment most likely to bring them to health, both physically and mentally, and to social maturity." *In re Marriage of Hansen*, 733 N.W.2d 683, 695 (Iowa 2007).

---

[1] By the time of the trial in this modification action in 2023, the parties' oldest child had reached adulthood, so the district court's ruling and this appeal concern only the two youngest children.

"A party seeking modification of a dissolution decree must prove by a preponderance of the evidence a substantial change in circumstances occurred after the decree was entered" that affects the welfare of the children. *Harris*, 877 N.W.2d at 440. That party "must also prove a superior ability to minister to the needs of the children." *Id.* Physical care should only be changed for the most cogent reasons. *Id.* The prevailing consideration is the best interests of the children. *In re Marriage of Hoffman*, 867 N.W.2d 26, 32 (Iowa 2015).

The children have lived their whole lives in the Marshalltown area. They have enjoyed academic success and are involved in extracurricular sports year-round. The district court found them to be "healthy and doing very well relative to their maturity and development," a finding with which we agree.

Both parents have remarried. At the time of the modification trial in 2023, the mother had been in a relationship with her now husband for at least eleven years and had been married to him for nearly two years. The father remarried in 2013. That marriage ended in divorce in 2020. The father married his current wife later that year. The children knew the father's second wife well and spent time with her during their visits with their father, but they have only met the father's current wife twice and do not have a relationship with her. The father has also moved several times and had many different jobs since the divorce. He currently rents a three-bedroom home in Omaha, Nebraska.

This modification action stems from a series of ill-conceived choices by both parents that have snowballed into a complete deterioration of the father's relationship with the children. As the parties' divorce was pending, the father moved away from the children to Fremont, Nebraska. He cites the presence of

family and a job opportunity as his reason for the move. However, the relocation left the children feeling abandoned. Despite this, the father maintained a good relationship with the children in the years immediately following the divorce.

Not unexpectedly, as the children grew older, their extracurricular activities began to interfere with the father's visitation schedule. By 2017, the father was receiving only about one-half of his visitation time. The reduced time partly resulted from the father allowing the children to skip visitation on many occasions out of a desire to prevent conflict and support the children's activities. The mother contributed to this reduction in visitation time by following a pattern of asking the children whether they wanted to spend the required weekend with their father. The mother would then report that the children had declined the visit. The father contends he was never given a clear answer as to why the children did not want to visit him, but he would typically respond to this news by telling the mother the children could stay home. He did not try to set up any alternatives to the missed visits, such as spending time with them at a halfway point such as Des Moines or visiting them in Marshalltown. The children's visits with the father continued to dwindle to the point that, by the time of the modification trial in 2023, his last overnight visit had occurred in the summer of 2020.

After the father filed this modification action, the guardian ad litem advised the parties to resume visits. In response, the mother started taking the children to the Des Moines exchange point. At the exchange point, the children often would spend only around half an hour talking with the father before returning home with the mother. There is no persuasive evidence suggesting the mother told the children she disapproved of them refusing visits or imposed any consequences for

them doing so. Additionally, at times over the years, the mother has told the children it is their choice whether they have weekend visits with their father.

The mother's failure to ensure the children visited the father coincided with failures to respect the joint-custody arrangement. Some of the examples shared by the father are overblown, but others are troubling. The mother permitted the children to use the stepfather's last name as their preferred name in sports and at school. The mother signed the children up for activities without consulting the father, even when she knew the activities would infringe on the father's visitation time. She refused to share information about the children's activity schedules and is not always forthcoming about their doctor's appointments. On one occasion she did not tell the father about a neck injury one of the children suffered while participating in sports. When the children got cell phones, the mother refused to give the phone numbers to the father until the guardian ad litem in this case insisted she do so. Even then, she gave the guardian ad litem the numbers instead of the father and did so only days before trial. At trial she claimed both that this was because the father was behind on his child support and that the children had asked her not to give the father their phone numbers.

The stepfather has also contributed to the problems with visitation by informing the father that he could not come to the children's travel baseball games without helping pay the costs and threatening to pull the children from the activity if the father appeared at any games. The children are also aware of some grievances between the mother or stepfather and father.

The evidence is clear that the mother has engaged in systematic efforts that have contributed to the children's alienation from the father.

But the father is not blameless. His efforts to maintain his relationship with the children have been too limited. The father has been hit or miss in sending birthday greetings to the children, and he has never sent Christmas or birthday gifts to them. The father seldom called the children on the mother's phone. During the two months he had the children's cell phone numbers before the end of trial, he texted them a few times but never called. He sometimes failed to show up for the visitation exchanges with no warning to the mother or children. The father misses most of the children's events. While his absences can in some part be explained by his distance from them, the fact remains that the distance is a product of his choices. The children are upset by his absences and notice when he only stays for a short time or arrives when events are almost over.

The younger child also reported that the father's accommodations for the children at his home have been unpleasant. He recounted that at times he and his brother slept on a mattress on the floor and were not provided clean sheets. The child has a cat allergy and explained that every weekend he would visit, cat hair would not be fully cleaned from the home, resulting in him feeling sick all weekend. While these issues could be easily remedied, the impression left on the children that the father is uninterested in providing the children with pleasant and healthy accommodations is harder to fix. In fact, the sum of the father's absences has left the children feeling as though the father doesn't truly care about having a relationship with them. The children state that he has not made a genuine effort to participate in their lives.

The question before us is whether the father has shown a superior ability to minister to the children's needs. *See Harris*, 877 N.W.2d at 440. On our de novo

review, we find the mother has undermined the father's relationship with the children for years by giving them the choice not to see him, failing to impose consequences when they refuse, and failing to communicate with the father about the children. When she takes the children to the exchange point for visits, she does not make sure they bring overnight bags, all but assuring they will return home with her instead of going with their father. We "consider the denial by one parent of the child's opportunity for maximum continuing contact with the other parent, without just cause, a significant factor in determining the proper custody arrangement." *In re Marriage of Udelhofen*, 444 N.W.2d 473, 475 (Iowa 1989) (citation omitted). In the past, we have sometimes modified physical care when a parent has undermined the other parent's relationship with the children. *See In re Marriage of Lindemeier*, No. 14-1321, 2015 WL 2089702, at *2–5 (Iowa Ct. App. May 6, 2015) (placing physical care with the father when the mother failed to share information about the children, mother had concerning temper issues, and children wished to live with the father); *In re Marriage of Downing*, 432 N.W.2d 692, 694– 95 (Iowa Ct. App. 1988) (placing physical care with the father when mother "intercepted mail sent to the children by [the father] and did not allow them to keep gifts from their father," interfered with the father's visitation rights, and made it impossible for the children to call their father, even at risk to their own safety).

While we condemn the mother's behavior, the father's limited efforts to keep in touch with the children persuade us that he has not met his burden to show he can provide superior care for the children. *See In re Marriage of Vrban*, 359 N.W.2d 420, 425–26 (Iowa 1984) ("[N]either the alleged alienation of the children nor the anticipated move to Colorado should deprive the children of the opportunity

to be raised by the person with greater parental skill and demonstrated concern for their well[-]being."). He has made minimal efforts to see the children outside of the required visits, and when these visits do not occur, he does not seek to make the time up. He has attended too few of the children's events and does not keep up communication with them through phone calls or other means. The father has not always provided a pleasant living environment for the children when they visit. The children are of the belief that their father does not love and care for them as a father should. While we have little doubt the mother has played a large role in the formation of this belief, the father bears responsibility as well. Ultimately, both parents have done a poor job facilitating the father's relationship with the children. The children are succeeding academically and in extracurriculars in the mother's care and, notwithstanding the difficult relationship with their father, they appear healthy, happy, and to be maturing well. We do not find that the father has proved by a preponderance of the evidence that he is better able to minister to the children's needs.

The children's interests are also best served by remaining with their mother. This was a contentious issue at trial, as both the guardian ad litem and the custody evaluator believed the children should be placed with their father and should not have contact with their mother for a few months. This no-contact period recommendation was intended to prevent the mother from interfering with the rebuilding of the relationship with the father. The custody evaluator also testified the children should receive therapy to help with the transition and rebuilding their relationship with the father. The father did not have a particular therapist in mind, nor did he mention if any therapists in his area specialize in that kind of therapy.

The custody evaluator also opined that it would be best if the father's wife lived elsewhere while the children adjust to the transition. The father ultimately agreed that he would follow that recommendation if necessary, but he was resistant to the idea. He suggested that his wife would be a neutral party in which the children could confide. This suggestion is concerning given the fact that the children have no relationship with the father's current wife and she has had vitriolic communication with the mother in the past. It is fair to say that both parents' current partners have contributed to the dysfunction of this family.

In concluding that a switch in physical care is not in the children's best interests, we also point to the opinions of the mother's expert witness, a psychologist, who performed a parenting evaluation on the mother. He found she was a fit parent with no mental-health conditions that would interfere with her parenting ability. He opined that the children feel abandoned by the father because of his inconsistent presence in their lives and that they resent the father for insisting the children always come to him. The mother's expert does not believe their relationship is irreparable but thinks forcing them to move in with the father will do more harm than good.

We also note that the mother offers more stability for the children. *See In re Marriage of Risbeck*, No. 12-1828, 2013 WL 1749822, at *3 (Iowa Ct. App. Apr. 24, 2013) (finding the mother's multiple remarriages and temporary living situation, compared to the father's long-term remarriage and permanent living situation, an important factor when modifying physical care). In addition, the children expressed a strong desire to stay with their mother and unhappiness at the thought of living with their father. While we do not give the children's preferences as much weight

as we would in an original custody action, we do consider them and take into account that both children are reasonably mature teenagers. *See Hoffman*, 867 N.W.2d at 35. Considering their success with their mother, their desire to stay with her, their feelings toward their father, and their strong ties to their community, modifying the physical care arrangement is not in the children's best interests.

In short, we find that removing these particular children from the only home, friends, and school they have ever known against their wishes to place them with a parent with whom they don't want a relationship would do more harm than good. As a result, we affirm the district court's decision to deny the father's request for a change in physical care of the children.

The father requested sole legal custody if we reversed the district court and gave him physical care of the children. Because we make no change to the physical-care arrangement, we also decline to change the legal-custody arrangement.

Finally, we reject the father's request for appellate attorney fees after considering the father's needs for an award, the parties' relative abilities to pay, and the father's lack of success on appeal. *See In re Marriage of Okland*, 699 N.W.2d 260, 270 (Iowa 2005) (noting the discretionary nature of awarding appellate attorney fees and listing factors to consider as "the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal" (quoting *In re Marriage of Geil*, 509 N.W.2d 738, 743 (Iowa 1993))).

**AFFIRMED.**